118-17-75 Raider Network v. Lamelia and the Chagall Good morning, members. My name is Jason Almey. I'm a representative of the Labor Network in this case. And I'd like to focus on two particular issues in this case. First is the finding of a causation by the arbitrator, which was adopted by the commission in this case. Finding a causal connection that respects the rights of others. The second issue is the reasonableness in accepting certain medical treatment that the claimant has. With respect to the first issue of the causal connection, the claimant testified that regarding the mechanism of the that her feet were stuck in a wood container, that she was trying to get material out of it, that she couldn't get her feet out of it. She started popping it up. She went forward with her chest, and went back with her head, and up her back against the container. Then she went to pull her right leg out and fell to the ground onto her knees. And she grabbed onto a pallet and sped up. The application indicates a lessening of the distance between the back, feet, neck, and legs, but not the shoulder. When she was presented some medical care, there were no shoulder movements, but she had a full range of motion of her experience. There were no x-rays that were undertaken of her shoulders. There were no MRIs that were ordered of her shoulders initially. In fact, there was no direct shoulder movement until two months after. So where did this rotator cuff tear come from? Well, according to both Dr. Shatner, as well as Dr. Finn, there was a problem that she had a rotator cuff tear. It may have been pre-existing, you can think about it, but in any case, it was actually a pre-existing rotator cuff tear. I don't think there's any dispute that the claimant had a rotator cuff tear. The issue is, was that rotator cuff tear caused by this event, or was it a degenerative condition or an existing condition? Is that the only theory on which you couldn't recover? What about the well-settled doctrine that even though the employee has a pre-existing condition or injury, recovery for the accidental injury will not be denied as long as it can be shown that the employment was a positive factor or aggravated the existing condition? Well, I think that that's one of the important issues that we should look at here. I would agree. When the arbitrator issued the decision, she relied on the mechanism of the injury as described by Dr. Shatner. Dr. Shatner's deposition indicates that the claimant was holding a piece of paper that was stuck out of this box and that that force that she had applied was the reason for this traumatic injury to her right shoulder. That's not what the claimant testified to. That's not what she reported in the medical record. Oh, that may be true, but didn't the testimony of Dr. Shatner and Novoselsky support her case? I don't think so, Your Honor. I think that what Dr. Shatner indicated in terms of the mechanism of injury wasn't any of the mechanisms that the claimant had described. He attributed her right shoulder rotator cuff tear to this force that was holding the paper. That's not what the claimant testified to. That's not what she had represented in her medical records. So in believing Shetty and Novoselsky, the commission couldn't do that? I think that the commission would rely upon an opinion of Dr. Shatner that is not consistent with the testimony of the claimant testified to in the trial as well as what she had represented to the medical record. So let's assume there's conflicting evidence in the case. Doesn't the commission still get to sort out the conflicting evidence and make the call? Well, I think that in this case, Your Honor, it's not necessarily that it's conflicting. They are relying on something that isn't there. There is no testimony. She doesn't say that that's what. She doesn't even testify as to that mechanism at all. There's no testimony regarding her pulling out sheet paper. She doesn't tell any of her medical providers that that's what caused her rotator cuff tear. And, in fact, it wasn't until two months later that she was released and complains of bleeding from her rotator, her right shoulder. And I think that Dr. Vinson, in that regard, is really illuminating. He states that there's a lack of correlation based on the mechanism and not the mechanism, that a rotator cuff tear is a crime. It has a possible attraction to her and her spending expenses. The second point, Your Honor, is regarding the using of this necessity for medical treatment. I'd like to focus on two particular things that I addressed in my testimony. And that's therapy that she had received from November 5, 2013, to January 20, 2014, as well as approximately $9,000 in unusual travel expenses. In terms of the therapy, again, Section 8 of the act indicates that the employer is responsible for providing medical care that is required to relieve or cure the effects of an accident. The Utilization Review was submitted, and that Utilization Review found that that therapy, in that period of time, was not provided to relieve or cure the effects of that injury. In fact, when the claimant presumes Dr. Chania after that, she indicates that the therapy wasn't helping her. There are no notes from those 16 visits. There's only the initial evaluations and summary reports. And even in those initial evaluations and summary reports, they're inconsistent with the records of Dr. Chania. Those therapy notes indicate that she had an improved gait, but the medical record before from Dr. Chania was the medical record after from Dr. Chania, indicating that she had a normal gait. So there was nothing to improve. It was already normal. Didn't Dr. Claudia conclude that the petitioner's work accident of July 19, 2013 was, quote-unquote, the cause of her right shoulder problem? Didn't he testify to that? He said in his deposition, I'll read the exact quote. I mean, it says she was trying to pull on paper that was stuck inside a box. So she was pulling forcefully with her arms and shoulders, and she was trying, bent down, trying to grab paper out of the box. So, I mean, I wasn't there at the interview. I don't have any evidence, but I mean, that's the best description I have of it, that she was, there was force applied to the shoulder. She was trying to pull paper that was stuck in between some pulleys, and that's when her shoulder became symptomatic, to my understanding. But that's not what she testified to, and that's not what she reported in the initial medical treatment. Nevertheless, he testified as to that. He testified as to this mechanism that doesn't show up anywhere else. So his opinion, in effect, should not be considered for anything because it's not based on the facts of the case. Correct. His opinion with regard to the method of the right shoulder should not be considered. Yeah, but I mean, overall, I mean, that's where the attack of opinion is based upon. Right, right. Any facts that are not in the evidence, that are not supported by any of the other evidence. The other point about the recent ones in assessing medical treatment, in addition to that therapy, was this unusual travel expense. As I said, it was about $9,000 in travel expense, $500 per, and looking at it, if this was transportation with universal health care or even from universal health care, based upon the fact that it was $370,000 for the initial therapy that she had been receiving, there's no indication as to, as I indicated in my brief, where she was going, the distance that was required to travel. I found $500 for travel to and from that provider, which, to be honest, based upon reviewing the record, it appears that this medical provider is approximately 25 miles from the plaintiff's house. So, if we're doing a rough estimate here, or a piece table of that, that's about $5 a mile. I don't believe that any of that, that there's no record of where these travel expenses are coming from, except for the bill. Again, I'm correlating the dates here with the treatment records. I'm assuming that that's where this is coming from, her transportation to and from the universal health care provider. But it's just simply unsupported. And there's nothing to indicate in the records, are the evidence presented that that was reasonable or not necessarily true to me or true to the effects of an accidental injury. In fact, you are already indicating that there's, that her son had taken her to the clinic. And that was part of the basis for this. It is not, unless you're honest with me, you can prove how reliable this is for the, maybe the argument is. You'll have time to reply. Okay. Thank you, Counsel. Good morning, Your Honor. Thank you. I'm Steve Long, on behalf of the New York Marriott Treadmill. To address counsel's points about the right shoulder, first of all, I want to clear up a misunderstanding. Counsel stated that it took two months for the New York Marriott Treadmill to get treatment for a right shoulder. That's simply not true. She did not treat for it in the emergency room on the day of the accident. That is correct. But at the first doctor she saw after the emergency room, within a week of the accident, she went to Dr. Martinez. And he was conducting tests. He found positive impeachment, pain, tenderness. I think the way to put it, I have some suspicion of a rotator cuff injury. In other words, within a week of the accident, she had a doctor complaining of right shoulder problems. And the only description she gives the doctor of why she might have any kind of problem is her orgasm from a few days before. As far as the cause of connection with Dr. Chatty is concerned, the description of the accident, there's a lot of stuff that could be going on. First of all, stop there. Claudia contributed. He gave the cause of connection opinion, didn't he? He did. He did. But he also said, you know, I wasn't there. I don't have your background. But there's no question from evidence that this was a woman in very good health before the accident. As soon as he said it was going to take an hour-long walk to get on it, she'd be working the garden, she'd be working at the racetrack, cleaning up the floor of the bathroom. And yet, one day she has a very traumatic accident, which her employer originally disputed. She has dropped that, you know, taken that out of communication, saying it was an issue that they were worried about the appeal. Dr. Chatty gave his opinion. He also said, listen, even if you think that this is some kind of pre-existing tear, he thinks it's a traumatic tear because he did the arthroscopic surgery and said it's a completely rotator cuff tear there, which would indicate that it's traumatic rather than degenerative. But even if there is a degenerative shoulder injury, you know, as the Board of Justice has pointed out, it proves that that is not a far compensation in the long run. It's only when you can show that there was an aggravation that it clearly occurs. And before this accident, she never saw a doctor for her shoulder. So you're saying there's a sufficient basis in the evidence to support the award. Correct. And another important point. So you're saying we shouldn't rely on that opinion. We don't have to because obviously he got the facts wrong. I don't think he got the facts wrong. Oh, he didn't? Doesn't that depend on which portion of her testimony you rely on? At one point in time, she testified, quote, got caught in the pellets while lifting materials while working for the employer. And he testified, Chetty's opinion was that given that pulling a fixed object with force, such as a box of paper, can cause a rotator cuff tear, was the basis for his finding. Now, there are other sections in her testimony which suggest that she wasn't lifting something when she got hurt. She fell down and her leg went under. But there clearly is testimony. At one point, she testified she was lifting a box of paper. And that's in agreement with what he said. That's in agreement with what he said was the cause of the injury. And another factor to consider here is in a manifesto case, it's up to the commission to decide on the credibility of the witnesses, especially of medical testimony. And it's obviously the commission found in favor of treating doctors and did not adopt it into Dr. McBain. And for good reason. When you look at Dr. McBain's opinion, he said that all she did was hurt her back. What she didn't mean was bruising one of her knees. She was talking about pain in the other knee that wasn't bruised. It's just not her opinion to say that all she did was sprain her back. This fall, when she showed up a couple of hours later, bruising on her knee. But the pain was in multiple parts of her body. So, again, in a manifesto case, we stick with the commission's determination as to which doctor is more credible. Let's throw the doctor out. Concede with your opponent that this opinion is not based on the facts or testimony or whatever. Does she still not prevail? Or would she still prevail? There's sufficient evidence in the record. What do you need? From Dr. Arcelia. His records note that these are all related to the accident. He does not need... Do we need the doctor? Let's put it down at the bottom. They don't. As I mentioned, I don't want to... Can't you say, I've had no problems and now I do? I don't want to get into the case, but the cause of infection showed up in clear picture before... Chain of events. Chain of events. Sorry. Beforehand, she's a healthy woman, walking out every day, gardening, getting down on her knees, doing all these things. They're traumatic accidents. It's not just a vague... Something, she may have delivered something off of a clear fall, and then her whole life has changed. There's many other ways to show that the commission made perfectly defensible decisions to correct one, but all we need to show is that it's a defensible decision and it is. So... And then just a brief word on the chain of referrals question that was in the briefs. Quite simply, both doesn't apply. It's a totally different situation. Both the claimant already had an established treating doctor for his injury. There was an antidote for 10 minutes before he decided to go to the emergency room. His complaints of pain were not... They were very minor. Nothing out of the ordinary for his injuries. In other words, it was a determination of credibility. The commission thought that this guy was trying to pull fast one on somebody somehow, and they said, no, that's not bona fide treatment. That's not what we have here. First aid treatment. There's no protocol for her and everybody. Blind leaders often might call an ambulance for Mr. Thurman to drag home. So this is a clear emergency situation. There's no problem with the chain of referrals here. But... I don't believe we do. Thank you. Counselor, you may reply. Thank you. I'll just touch on the issue regarding the presentation of the implants in the shoulder to Dr. Marsiglia. Those complaints of the shoulder were actually pain numbers radiating from the neck into the shoulder. In fact, in response to those complaints, he had a cervical MRI, now shoulder MRI, now shoulder X-ray. So those would be related to the neck, not the shoulder. Yet the first time that she presented, the actual implants involving the right shoulder wasn't associated with Dr. Thurman. I would honestly touch upon the chain of events here, where it's a condition of relatively good health, something that happens, and then subsequently negative health. In this situation, again, two months later, before she reports any complaints regarding directly involving the right shoulder. In fact, Dr. Shadid indicates that with that type of rotator cuff there, you would expect immediate complaints of pain. You would expect loss of mobility in that arm, or loss of mobility for that extremity. That wasn't the case. She had full range of motion throughout the first two months of her presentation involving the right shoulder. Even if you were to describe some sort of chain of events here, that doesn't fit into this particular scenario. We have a long delay, not an immediate, good health, something happens, now it's a problem. It's good health, something happens, two months later, now we have a problem. You know? And you're going to treat a patient and say, well, that is somewhat suspect. No, we didn't. Thank you. Thank you, counsel, both for your arguments. This matter was taken under advisement and a written disposition shall be issued.